UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>KEY3MEDIA GROUP, INC., et al.,[1]<br><br>        Debtors. | Chapter 11<br>Case No. 03-10323 (MFW)<br><br>Jointly Administered |
| KEY3MEDIA GROUP, INC.,<br><br>        Appellee,<br><br>v.<br><br>PULVER.COM, INC.; PULVER.COM EUROPE, LTD.; PULVER.COM ASIA, LTD.; PULVER.COM CONFERENCES, INC. and JEFFREY PULVER,<br><br>        Appellee,<br>and<br><br>MEDIALIVE INTERNATIONAL, INC. f/k/a Key3Media Group, Inc.,<br><br>        Third Party Appellee. | Civ. No. 05-828 (SLR) |

<u>APPENDIX OF APPELLANTS, INTERFACE GROUP-MASSACHUSETTS, LLC, INTERFACE GROUP-NEVADA, INC. and VENETIAN CASINO RESORT, LLC</u>

**CONFIDENTIAL – FILED UNDER SEAL
SUBJECT TO A CONFIDENTIALITY AGREEMENT**

[SIGNATURE PAGE TO FOLLOW]

---

[1] The Debtors are Key3Media Group, Inc., Key3Media Events, Inc., Key3Media VON Events, Inc., Key3Media BCR Events, Inc., Key3Media Advertising, Inc. and Key3Media BioSec Corp.

Charles J. Brown III (No. 3368)
ELZUFON, AUSTIN, REARDON,
TARLOV & MONDELL, P.A.
300 Delaware Avenue
Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630

and

Stephen F. Gordon (Mass BBO#203600)
Peter J. Haley (Mass BBO#543858)
Leslie F. Su (Mass BBO#641833)
Gordon Haley LLP
101 Federal Street
Boston, Massachusetts 02110
(617) 261-0100

Attorneys for Appellants, Interface Group-Massachusetts, LLC, Interface Group-Nevada, LLC d/b/a Sands Expo and Convention Center and Venetian Casino Resort, LLC

April 17, 2006

**DUPLICATE**

## Table of Contents

Deposition of Peter Knepper dated May 28, 2003
(D.I. 34, Ex. A) ............................................................................................ A 1 – A 27

Memorandum of Opinion and Order Granting Motion
for Order Approving Settlement between Debtors and Avoidance
Defendants dated October 7, 2005
(D.I. 42).......................................................................................................... A 28 – A 43

Pages A1 through A27 have been redacted

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:

KEY3MEDIA GROUP, INC., *et al.*,[1]

Debtors.

In Proceedings Under Chapter 11

Case No.: 03-10323
(Jointly Administered)

---

KEY3MEDIA GROUP, INC.,
on behalf of the substantively
consolidated post-confirmation estate,
and in particular, Class 4 creditors
under the Debtors' confirmed Joint
Amended Plan of Reorganization,

Plaintiff,

PULVER.COM, INC., *et. al.*,[2]

Defendants and
Third Party Plaintiffs

Adv. Proc. No. 04-57972

JUDGE RANDOLPH BAXTER

---

MEDIALIVE INTERNATIONAL
INC. (f/k/a Key3Media Group, Inc.),

Third Party Defendant

## MEMORANDUM OF OPINION AND ORDER

Before the Court is the Joint Motion of AlixPartners ("Creditor Representative") and

---

[1] The Debtors are Key3Media Group, Inc., Key3Media Events, Inc., Key3Media VON Events, Inc., Key3Media BCR Events, Inc., Key3Media Advertising, Inc., and Key3Media BioSec Corp. (collectively, the "Debtors").

[2] The Defendants and Third Party Plaintiffs are Pulver.com, Inc., Pulver.com Europe, Ltd., Pulver.com Asia, Ltd., Pulver.com Conferences, Inc., and Jeffery Pulver (collectively, the "Defendants" or "Pulver").

1

Key3Media Group, Inc. ("Debtors"), on behalf of the Debtors' post-confirmation estate, for an Order Approving Settlement Between the Debtors and Avoidance Defendants in the above-styled adversary proceeding. The Interface Creditors[3] filed an objection to the Debtors' Motion.

The Court acquires core matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), (b) and 1334(b). Upon a duly noticed hearing, the following factual findings and conclusions of law are hereby rendered:

*

The Debtors own and operate information technology events throughout the world. Defendant Pulver produces conferences and trade shows in the Voice Over the Internet Protocol industry. On September 10, 2001, through an Asset Purchase Agreement, the Debtors acquired two event brands from Pulver. The initial agreement called for an immediate payment of $36,000,000, with the remaining amounts to be placed in escrow to be dispersed in accordance with the EBITDA performance of certain Pulver events. On August 22, 2002, the Debtors and Pulver entered into an agreement to fix the final purchase price at $41,502,000.

On February 2, 2003, the Debtors filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Court entered an Order Confirming the Debtors' First Amended Joint Plan of Reorganization (the "Plan") on June 4, 2003. The Plan became effective on June 20, 2003.

On December 17, 2004, pursuant to Section 6.7 (a) of the Plan, the Debtors, on behalf of

---

[3] Interface Group-Massachusetts, LLC, Interface Group-Nevada, Inc., and Venetian Casino Resort, LLC (collectively, the "Interface Creditors"). The Interface Creditors collectively hold allowed unsecured claims in excess of $10 million.

2

the Creditor Representative,[4] filed an action to avoid two alleged fraudulent transfers: (1) the September 10, 2001 transfer pursuant to which the Debtors acquired Pulver.com from the Defendants for a total purchase price of $41,502,000; and (2) the January 24, 2003 transfer pursuant to which the Debtors sold Pulver.com back to the Defendants for approximately $4,375,000.

Defendant Pulver filed an answer, and brought counterclaims against the Debtors for breach of contract and indemnification, and filed a Third Party Complaint against one of the reorganized Debtors, MediaLive International, Inc. for breach of covenants of indemnification and warranty set forth in the 2001 and 2003 purchase agreements. The Defendants claim that the alleged breaches absolve them of any liability for the Plaintiff's avoidance claims.[5]

The Creditor Representative and the Debtors (including Third Party Defendant Media Live International, Inc.) have reached a settlement with Defendant Pulver regarding the two avoidance actions.[6] The Settlement Agreement calls for the payment of $1,150,000 from Pulver to the Creditor Representative in installments of (i) $600,000 within five days of the Court's approval of the Settlement Agreement, then (ii) $100,000 per month for five months, and (iii) $50,000 in the sixth month. The Settlement Agreement also calls for each side to release the other from any and all related claims.

---

[4] Section 6.7(a) of the plan provides that the duly appointed Creditor Representative may require and direct the Reorganized Debtors to bring avoidance actions on behalf of creditors, and to direct the prosecution of such actions in all aspects under the Creditor Representative's supervision and direction.

[5] Debtor's Motion, at 3.

[6] *See* Settlement Agreement and Mutual Release, Exhibit A to Debtors' Motion

The Creditor Representative and the Debtors now seek approval of the Settlement Agreement pursuant to Rule 9019. FED. R. BANKR. P. 9019.

\*\*

The Debtors argue that the proposed settlement should be approved because it is supported by sound business justifications and is reasonable. They also argue that litigation of a fraudulent transfer claim would be complex, and would require extensive discovery, with professional fees in excess of $500,000.[7] Further, the analysis of reasonably equivalent value could range considerably. The Debtors note that Pulver has also raised counterclaims which, if successful, would negate the Debtors' recovery. Finally, even if successful, since Pulver is a privately held entity of unknown equity, the ability of the Debtors to recover could be questionable or delayed.[8]

The Objection of the Interface Creditors argues that the estate has a very strong cause of action against the Defendants, and therefore, the probable outcome of the litigation outweighs the expense.[9] To support its belief that it would be successful in litigation, the Interface Creditors point to the facts that the Debtor sold assets for $4,375,000 in 2003 only two weeks before it filed for relief under the Bankruptcy Code, and that the sale came only six months after finalizing the purchase price of the same assets for $41,502,000.[10] Additionally, the sale price was lower than a renegotiated sale price of $8,000,000 that was discussed in December 2002.

---

[7] Debtors' Motion, at 6.

[8] *Id.*

[9] Objection of the Interface Creditors, at 4-5.

[10] *Id.* at 4.

4

Further, the Interface Creditors argue that the expenses of litigation would be outweighed by the likelihood of recovery. On this point, their Objection notes that the estate has already expended fees of $9,600,000 on other administrative fees and expenses related to the Bankruptcy filing. The Interface Creditors also refer to its counsel's offer to prosecute the underlying proceeding on a contingency fee basis of forty percent (40%) of the amounts recovered in excess of $1,150,000, with costs to be paid by the estate as incurred.[11] Finally, addressing the Debtors' concern for the ability to recover a judgment from the Defendants, the Interface Creditors argue that Pulver has recently received about $41,500,000 in cash from Key3Media in the subject transactions.

In response, the Debtors argue that the proposed compromise provides substantial benefit to the estate. The Debtors note that the decline in price is largely explainable by the effects of September 11, 2001 on the willingness of customers to travel, and by general business trends in the internet industry.[12] Debtors also deny the existence of a purported $8,000,000 purchase agreement negotiated in December 2002, and allege that the $4,375,000 sale price was a market price for the business obtained after unsuccessful efforts to find an alternative buyer.[13] Finally, Debtors note that the Objection of the Interface Creditors does not address the possibility of a ruling in favor of Pulver's counterclaims, which would nullify any avoidance recovery, regardless of the strength of the avoidance claims.[14]

---

[11] *Id.* at 5 n.2.

[12] Debtors' Reply, at 2.

[13] *Id.*

[14] *Id.*

5

\*\*\*

Pursuant to Bankruptcy Rule 9019(a), the authority to approve a compromise settlement is within the sound discretion of the bankruptcy court. *See, e.g., In re Coram Healthcare Corp.*, 315 B.R. 321, 329 (Bankr. D. Del. 2004); *In re Trism, Inc.*, 282 B.R. 662, 666 (B.A.P. 8th Cir. 2002). In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interest of the estate. *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

Under Rule 9019(a), the bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). To be informed the bankruptcy court "must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *In re Martin*, 91 F.3d at 393.

In its efforts to resolve the matter, "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement." *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir.1997). Nor is the court required to make a determination that the settlement is the best possible compromise. *In re Coram*, 315 B.R. at 330. In determining whether to approve a settlement,"[t]he court is not supposed to have a 'mini-trial' on the merits, but should 'canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.'" *E.g., In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D. N.J. 2000) (citing *In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa.1986)).

6

When determining whether a compromise is in the best interests of the estate, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citing *TMT Trailer Ferry*, 390 U.S. at 424-25). Four criteria that a bankruptcy court should consider in striking this balance include (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *Id.* Additionally, the Court should consider the proposition that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Id.* (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993)); *see also In re Beaulac*, 294 B.R. 815, 819 (B.A.P. 1st Cir. 2003).

The Debtors carry a burden of persuasion to provide the court with sufficient information to conclude that the compromise falls within the reasonable range of litigation possibilities. *See In re Coram* (citing *In re Penn Central Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979)); *In re Lawrence & Erasquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990). This is not, however, a burden of proof regarding the underlying claim. While a court generally gives deference to a Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved. *In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003); *see also In re Vazquez*, 325 B.R. 30, 36 (Bankr. S.D. Fla. 2005) ("The court is neither to 'rubber stamp' the [Debtors'] proposals nor to substitute its judgment for the trustee's.").

****

7

A 34

For the reasons below, the Court finds that the proposed settlement reached by the Creditor Representative, the Debtors, and the Defendants is fair, equitable, and in the best interest of the bankruptcy estate.

1. **Probability of Success**

The Debtors' complaint brought claims under 11 U.S.C. §§ 544(b), 548, 550 and New York Debtor and Creditor Law §§ 273, 274. Under the Bankruptcy Code and New York Debtor and Creditor Law,

> [I]n order for a transfer of a debtor's interest in property or any obligation incurred by the debtor to be considered a fraudulent conveyance and to be avoided, the Trustee must show that the debtor received less than reasonably equivalent value in exchange for such transfer or obligation (using the language of the Bankruptcy Code) or that the conveyance was made without fair consideration (using the language of the New York Debtor and Creditor Law).
>
> Courts typically use these terms interchangeably, and do not usually make a distinction between the standard required for reasonably equivalent value, on the one hand, and fair consideration, on the other. Accordingly, this Court too will use these terms interchangeably for the purposes of this decision, and will treat the Trustee's claims under section 548(a)(1)(B) of the Code and under sections 273 and 274 of the New York Debtor and Creditor Law collectively.

*In re AppliedTheory Corp.*, 323 B.R. 838, 840-41 (Bankr. S.D.N.Y. 2005); *In re Foxmeyer Corp.*, 286 B.R. 546, 570 (Bankr. D. Del. 2003) (concluding that New York Debtor and Creditor Law sections 273-75 were essentially identical to § 548(a) of the Bankruptcy Code). The burden of proving that the debtor received less than reasonably equivalent value under § 548 rests upon the trustee. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991).

Under fraudulent transfer law, the determination of reasonably equivalent value should consider the totality of the circumstances, including "a variety of factors, such as the fair market value of the item or service received compared to the price paid, the arms-length nature of the

8

transaction, and the good faith of the transferee." *E.g., In re Burry*, 309 B.R. 130, 137 (Bankr. E.D. Pa. 2004) (citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148 (3d Cir. 1996)); *In re Exide Technologies, Inc.*, 299 B.R. 732, 748 (Bankr. D. Del. 2003). Further, the determination of reasonably equivalent value must be made at the time of the transaction. *In re Morris Communications NC*, 914 F.2d 458, 466 (4th Cir. 1990) (citing COLLIER ON BANKRUPTCY § 548.09 (15th ed. 1984)) ("The critical time is when the transfer was 'made.'"); *In re Calvillo*, 263 B.R. 214, 219 (W.D. Tex. 2000) (citing *Matter of Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125-26 (5th Cir. 1993)); *Peltz v. Hatten*, 279 B.R. 710, 737 (Bankr. D. Del. 2000).

Therefore, in order to prevail on the merits of the underlying fraudulent transfer action, the Debtors would carry the burden of showing, by a preponderance of the evidence, that, at the time of the transactions in question, they paid (in the 2001 purchase) and received (in the 2003 sale) less than reasonably equivalent value for the Pulver assets. For the allegations regarding the 2001 purchase, the Debtors would be required to establish that the price paid (ultimately agreed to be $41,502,000) was unreasonably high in comparison to the value of the Pulver assets in September 2001. Similarly, in order to prevail on its allegations regarding the 2003 sale, the Debtors would have the burden of showing that the price received ($4,375,000) was unreasonably low in comparison to the value of the Pulver assets in January 2003. In both instances, the Debtors would be faced with the inherently difficult proposition of establishing the "true value" of the Pulver assets at the time of the transaction in question.

Despite this burden of proof, the Interface Creditors assert that the "estate has a very

strong cause of action against these Defendants."[15] The Interface Creditors look to the drastic decline in price as evidence that the Debtors did not receive reasonably equivalent value in one or both of the transactions in question.[16] They also point out that the original purchase price of $41,502,000 was finalized in August 2002, only six months before the Debtors agreed to sell the same assets for $4,375,000. Additionally, the Interface Creditors cite an alleged $8,000,000 renegotiated sales price in December 2002.

The Debtors, however, offer contradictory explanations for the dramatic decline in the price of the Pulver assets. According to the Debtors, Pulver.com "relies heavily on, among other things, customers' willingness to travel to the events of September 11, 2001, the day following closing of the 2001 Sale, as well as general business trends in the internet industry."[17] The Debtors also note that the assertion that the original purchase price was finalized only six months before the final sale is misleading, as it ignores the fact that the original sales agreement was made in September 2001, with an immediate cash payment of $36,000,000. The August 2002 agreement merely finalized the distribution of the remaining funds held in escrow. Further, the Debtors vehemently deny the existence of an agreement to sell the Pulver assets for $8,000,000.[18] Debtors further note that the January 2003 sale price was negotiated after being unsuccessful in its attempts to find an alternative buyer, despite the use of investment bankers to attract interest. Therefore, Debtors claim that the $4,375,000 price received in January 2003 was a market price

---

[15] Objection of the Interface Creditors, at 4.

[16] *Id.*

[17] Debtor's Reply, at 2.

[18] *Id.*

for the Pulver assets.

The Interface Creditors challenge the reasonableness of the transaction price on the purchase and subsequent resale of the Pulver assets. No valuation data was introduced by the Interface Creditors to support a different market price. The fact that the Debtors later chose to sell the assets for a much lower price than it originally paid is not sufficient, alone, to show that it did not receive a reasonably equivalent value in either transaction. *In re R.M.L., Inc.* 92 F.3d at 151 (rejecting an approach that would "permit a court viewing the events with the benefit of hindsight to conclude that any transfer that did not bring in the actual, economic equivalent of what was given up fails to confer reasonably equivalent value as a matter of law.").

Further, the valuation of intangible assets, such as the Pulver brand names, is inherently difficult to establish conclusively. *See Seaboard Finance Co. v. Martin*, 244 F.2d 329, 331 (5th Cir. 1957) ("The good will represented by a corporate name or a trade name is intangible and difficult of exact description or valuation."). This is especially true in the Internet and technology industries, as the sharp decline in the market value of the Pulver assets was not an isolated occurrence during the relevant time period.

The good faith of the Debtors and the arms length nature of the transactions have not been questioned by the Interface Creditors. The Debtors strongly argue that they engaged in significant due diligence prior to both transactions. That assertion was uncontroverted by any party in interest, including the Interface Creditors. The 2001 purchase price of $41,502,000 was based in part upon a multiple of 5.75 times the approximate $7,000,000 of EBITDA generated by the Pulver assets.[19] For various reasons, the EBITDA of the Pulver assets fell to a level of

---

[19] Deposition of Peter Knepper, at 74-75.

11

$1,000,000 projected for 2003.[20] The fact that EBITDA fell well short of projections, however, does not show that the forecasts made at the time of the purchase were unreasonable, especially when the subject assets were directly affected by unforeseen incidents, such as the terrorist attacks of September 11, 2001 or the economic woes which befell the internet industry. Predicting the operating performance of the Pulver assets was an exercise of the business judgment of the Debtors. *See In re Adelphia Communications Corp.*, 2004 WL 1634538, *3 (Bankr. S.D. N.Y. 2004) (holding that "[p]redictions of that character are, at best, educated guesses," and that the Debtor's assessment of risk "is exactly the kind of business decision that the business judgment rule respects."). Even a Debtor exercising the most cautious judgment, however, could not have been expected to foresee the occurrence of such events at the time of purchase, and then to incorporate the effects of those events in the valuation of the Pulver assets. *See Hotel Employees and Restaurant Employees Intern. Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175, 181 (3d Cir. 1999) (citing 20 C.F.R. § 639.9(b)) ("The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services."); *In re Organogenesis Inc.*, 316 B.R. 574, 588 (Bankr. D. Mass. 2004). The Debtors, therefore, would be faced with a difficult burden of showing that it was unreasonable assumptions, and not the effect of these catastrophic events, that led them to overvalue the Pulver assets.

The Debtors would face similar obstacles in prevailing on its claims regarding the 2003 sale. Given the intangible and nature of the Pulver assets, and the industries from which they derived their revenue, the prevailing market price during the transaction period is likely to be the

---

[20] *Id.* at 75.

12

most accurate assessment of value for assets of this nature. *In re Bennett Funding Group, Inc.*, 232 B.R. 565, 572 (Bankr. N.D.N.Y. 1999) (recognizing that even a discount from estimated market value may be considered reasonable where the transaction involves a unique object, or intangible property); *In re Bay Plastics, Inc.*, 187 B.R. 315, 330 (Bankr. C.D. Cal. 1995) ("The values of assets must be updated in light of subsequent use and market conditions: in accounting parlance: they must be 'marked to market.'"). There is persuasive evidence to support the Debtors' claim that they received market price for the Pulver assets. The Debtors employed investment bankers to market the Pulver assets. Although market price is not the only factor to be considered in the determination of "reasonably equivalent value," it would be exceedingly difficult for the Debtors to show that the value received was substantially less than the true value of the assets at the time. *See In re Perry County Foods, Inc.*, 313 B.R. 875, 895-96 (Bankr. N.D. Ala. 2004) (noting that courts measuring reasonably equivalent value "have consistently viewed its location to be a point on a continuum of prices which is at and below to some degree the market value."); *In re Colonial Realty Co.*, 226 B.R. 513, 523 (Bankr. D. Conn. 1998) (citing *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir.1990)) ("Fair market value, while not dispositive, is an important element and often a starting point for determining reasonably equivalent value.").

For these reasons, the Court finds that probability of success in litigation is low.

2.  **Likely Difficulties in Collection**

The most immediate difficulties associated with collection are the Defendant's counterclaims and third party claims. A successful result in the primary litigation would require further litigation on the Defendant's breach of contract and indemnity claims. Even if the

13

fraudulent transfer claims were to be successfully litigated, the Defendant's breach of contract and indemnity claims would negate any recovery to the Debtors. Although the Creditor Representative and the Debtors believe that they would be able to successfully defend against the Defendant's claims,[21] the possibility remains that the Debtors would not receive any proceeds from the litigation, or at least that such recovery would be delayed. The collection of a judgment could be further delayed by the potential for appeal by the Defendant.

The Debtors also claim that Defendant is a privately held entity of unknown equity, and that its ability to pay a multi-million dollar judgment is highly questionable.[22] This argument, however, is without evidentiary support.

### 3.    Complexity, Expense, Inconvenience, and Delay of Litigation

It is undisputed that this matter would involve expert testimony, motion practice, and extensive discovery. The Debtor estimates that these costs could easily exceed $500,000.[23] The Interface Creditors make three responses to these potential costs. First, the Interface Creditors note that the estate expended $9,600,000 in administrative fees and expenses between February 2003 and June 2003 in the Chapter 11 proceedings. Second, the Interface Creditors believe that the costs are outweighed by the probable outcome of the litigation. Third, the Interface Creditors state that their own counsel would be willing to accept the matter on a contingency fee basis of 40% of the amounts recovered in excess of $1,150,000, costs to be paid by the estate.

The Interface Creditors' objections on this point are without merit. The prior costs

---

[21] Debtors' Motion, at 7.

[22] *Id.*

[23] *Id.*

14

A 41

already incurred by the estate are irrelevant in the determination of whether a current settlement proposal is in the best interests of the estate. Administrative fees and expenses are necessary, and often non-discretionary, costs to obtaining the relief provided by Chapter 11. The fact that the Chapter 11 process has been costly thus far does not make future expenses more favorable. The issue at hand is whether the net benefits of *this* litigation are outweighed by the value of the proposed settlement.

The self-serving offer of the Interface Creditors' counsel to prosecute this matter on a contingency fee basis may arguably mitigate the costs of litigation, but does not necessarily eliminate the costs involved, either monetarily, or in terms of the delay involved.

4.    **Paramount Interest of Creditors**

While creditors' objections are not controlling, emphasis is placed on the paramount interests of creditors and proper deference given to reasonable views set forth in their objections. *In re American Reserve Corp.*, 841 F.2d 159, 161-62 (7th Cir. 1987); *In re A & C Properties*, 784 F.2d 1377, 1382 (9th Cir. 1986). In addition to the creditors' objections, the court may give weight to the opinions of the trustees, the parties, and their counsel, in determining the reasonableness of the proposed settlement. *In re A & C Properties*, 784 F.2d at 1382. As the largest independent claimholders in these proceedings,[24] the Court has given the Objection of the Interface Creditors proper deference in determining what constitutes the best interests of the estate.

On the other hand, the objections of the Interface Creditors cannot be permitted to predominate over the best interests of the estate as a whole. *See In re American Reserve Corp.*,

---

[24] Objection of the Interface Creditors, at 5.

15

841 F.2d at 162 (when determining whether a proposed settlement is in an estate's best interests, the court "must necessarily examine the relative priorities of the contested claim and the estate's other claims."); *In re Flight Transp. Securities Litigation*, 730 F.2d 1128, 1138 (8th Cir. 1983). In this regard, it is of significance that a consortium of secured lenders, collectively, possess blanket liens on all of the Debtors' assets. Not only have such lenders supported the resale of the Pulver assets by the Debtors, it is unrefuted that they are not opposed to the present Motion to Approve Settlement.

## CONCLUSION

Accordingly, the Motion for Order Approving Settlement is hereby GRANTED. The objection thereto is OVERRULED. Each party is to bear its respective costs.

IT IS SO ORDERED.

Dated, this 7TH day of October, 2005

JUDGE RANDOLPH BAXTER
UNITED STATES BANKRUPTCY COURT