IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KEY3MEDIA GROUP, INC., et al.,[1]<br><br>    Reorganized Debtors. | Chapter 11<br><br>Case No. Case No. 03-10323 (KJC)<br><br>(Jointly Administered) |
| KEY3MEDIA GROUP, INC., on behalf of the consolidated post-confirmation estate, and in particular, Class 4 creditors under the Debtors' confirmed Joint Amended Plan of Reorganization,<br><br>    Plaintiffs,<br><br>      v.<br><br>PULVER.COM, INC.; PULVER.COM EUROPE , LTD.; PULVER.COM ASIA, LTD.; PULVER.COM CONFERENCES, INC. and JEFFREY PULVER,<br><br>    Defendants and Third Party Plaintiffs. | Adv. Proc. No. 04-57972 (KJC)<br><br>Civ. Action No. 05-828 SLR<br><br><br>**REDACTED**<br><br><br>**CONFIDENTIAL**<br>**FILED UNDER SEAL**<br>**SUBJECT TO A CONFIDENTIALITY AGREEMENT** |
| MEDIALIVE INTERNATIONAL, INC. (f/k/a Key3Media Group, Inc.),<br><br>    Third Party Defendant. | |

## APPELLEES' ANSWERING BRIEF

Laura Davis Jones (DE Bar No. 2436)
Andrew W. Caine (CA Bar No. 110345)
Sandra G. M. Selzer (DE Bar No. 4283)
PACHULSKI STANG ZIEHL YOUNG
    JONES & WEINTRAUB LLP
919 North Market Street, 16th Floor
Wilmington, DE 19899-8705 (Courier 19801)

**Counsel for Creditor Representative and
Special Counsel For Reorganized Debtors**

Dated: May 17, 2006

John H. Knight (DE Bar No. 3848)
Jason M. Madron (DE Bar No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

Robert M. Novick (*pro hac vice*)
KASOWITZ, BENSON, TORRES &
    FRIEDMAN LLP
1633 Broadway
New York, NY 10019
**Co-counsel for Reorganized Debtors**

---

[1] The Reorganized Debtors are Key3Media Group, Inc., Key3Media Events, Inc., Key3Media VON Events, Inc., Key3Media BCR Events, Inc., Key3Media Advertising, Inc. and Key3Media BioSec Corp.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 2

    A.    Identity of the Parties ................................................................................ 2

    B.    Case Background ...................................................................................... 3

    C.    The Bankruptcy Court's Ruling ............................................................... 9

ARGUMENT ..................................................................................................................... 11

    A.    Approval of a 9019 Compromise is Reviewed for Abuse of Discretion. ............. 11

    B.    The Bankruptcy Court Did Not Abuse its Discretion ............................. 12

    C.    The Interface Creditors Cannot Challenge the Manner in Which the Moving Parties Made Their Showing ..................................................... 16

        1.    The Interface Creditors Waived Their Right to Argue That The Showing in Support of the Motion Was Insufficient. ............................... 17

        2.    The Deposition Transcript Establishes That the Bankruptcy Court Did Not Abuse its Discretion. .................................................................. 18

        3.    Almost All Facts Are Undisputed. ............................................................ 19

CONCLUSION .................................................................................................................. 19

i

# TABLE OF AUTHORITIES

Page

**CASES**

*Brown v. Philip Morris Inc.,*
 250 F.3d 789 (3rd Cir. 2001) ............................................................... 17, 18

*Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.),*
 283 F.3d 159 (3d Cir. 2002) ................................................................. 12

*In re Jasmine, Ltd.,*
 258 B.R. 119 (D. N.J. 2000) ................................................................. 13

*In re Neshaminy Office Bldg. Assocs.,*
 62 B.R. 798 (E.D. Pa. 1986) ................................................................. 12

*In re Nutraquest, Inc.,*
 434 F.3d 639 (3rd Cir. 2006) ........................................................... 11, 12

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
 246 F.3d 315 (3rd Cir. 2001) ................................................................ 12

*In re Woodson,*
 839 F.2d 610 (9th Cir. 1988) .............................................................. 10

*Myers v. Martin (In re Martin),*
 91 F.3d 389 (3d Cir. 1996) .................................................... 10, 12, 13, 15

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
 390 U.S. 414 (1968) ............................................................................. 13

*United Parcel Serv. Inc. v. International Brotherhood of Teamsters,*
 55 F.3d 138 (3rd Cir. 1995) .................................................................. 17

*United States v. Anthony Dell'Acquilla Enter. & Subsidiaries,*
 150 F.3d 329 (3d Cir. 1998) ................................................................. 17

**RULES**

Fed. R. Bankr. P. 2002 ............................................................................. 12

Fed. R. Bankr. P. 9019 ............................................................................. 12

Alix Partners, as the creditor representative duly appointed to serve as the

independent fiduciary for all unsecured creditors pursuant the First Amended Joint Plan

of Reorganization for Key3Media Group, Inc., et al. (the "Creditor Representative"), and

the above-captioned reorganized debtors (the "Reorganized Debtors" and, together with

the Creditor Representative, the "Appellees") hereby submit the following as their

Appellees' Answering Brief.

## INTRODUCTION

In this case, the Creditor Representative is faulted for settling too soon and,

thereby, failing to spend what almost certainly would have been the hundreds of

thousands of dollars necessary to establish beyond a shadow of a doubt that the

compromise at issue here is a good one. In a case like this one, where the claim is

brought by an independent fiduciary such as the Creditor Representative, the law does not

require that settlement be postponed while the costly wheels of litigation turn. Where the

appropriate showing is made (as it was in the bankruptcy court below), compromises are

favored and should be approved.

Appellants Interface Group-Massachusetts, LLC, Venetian Casino Resort, LLC,

Interface Group, Nevada, Inc., (collectively, the "Interface Creditors") claim that the

bankruptcy court did not have (1) the right kind of evidence or (2) enough evidence to

approve the compromise and, therefore, the bankruptcy court abused its discretion.

These arguments are specious because they demonstrate a complete misunderstanding of

both legal standards for approving an arm's-length settlement, and for overturning an

approved settlement on appeal. The bankruptcy court had all the information it needed to

canvass the issues and make an informed determination regarding the *bona fides* of the settlement as evidenced by, among other things, (i) the fifty-seven (57) page transcript of the August 25, 2005 hearing held before the bankruptcy court to consider approval of the Settlement (as defined below) and (ii) the sixteen (16) page Memorandum of Opinion and Order, dated October 7, 2005 (the "Opinion") issued by the bankruptcy court thereon. Clearly, as set forth below in greater detail, there was no abuse of discretion here and the decision of the bankruptcy court should be affirmed.

## STATEMENT OF FACTS

### A.     Identity of the Parties

The Creditor Representative is an independent fiduciary appointed under the Plan to collect proceeds and distribute them to the holders of allowed unsecured claims (who will receive at least three cents on the dollar, but perhaps not much more). Section 6.7(a) of the Plan provides that the Creditor Representative may require and direct the Reorganized Debtors to bring avoidance actions on behalf of creditors, and to conduct the prosecution of such actions in all aspects under the Creditor Representative's supervision and direction. This appeal stems from such an action.

Prior to the Petition Date (as defined below), the Reorganized Debtors were the world's leading producer, manager and promoter of tradeshows, conference and other events for the information technology industry. The Reorganized Debtors' First Amended Plan of Reorganization (the "Plan") received the overwhelming support of all creditor constituencies. Indeed, the Plan was accepted by 100% in number and amount of voting holders of Class 2 Prepetition Secured Lender Claims; and approximately 90.3%

2

in number and 95.1% in amount of the voting holders of Class 4 General Unsecured

Claims. Of the few rejecting creditors, 65% in amount and 27% in number were

affiliated with the Interface Creditors.

The Interface Creditors are controlled by Sheldon Adelson, who founded the

COMDEX show in the early 1980s and sold it in 1995 to a predecessor of the Debtors

with certain additional assets for a reported $850 million. On the day the Debtors

commenced their bankruptcy cases, the trade press reported that Mr. Adelson had stated

he intended to re-enter the trade show business and compete with the Debtors.

Thereafter, the Interface Creditors objected to nearly all relief sought by the Debtors in

their chapter 11 cases, no matter how innocuous or necessary to preserve the value of the

estates, even where it required them to take positions that were contrary to their own

economic interests as putative unsecured creditors. These actions have cost the Interface

Creditors hundreds of thousands of dollars in pointless legal fees – and cost the estates at

least that amount. Appellees submit that this appeal is just another (and hopefully the

last) attempt to obstruct the Reorganized Debtors' efforts to repay their creditors in

accordance with the Plan, and move on with their businesses.

**B.    <u>Case Background</u>**

The following facts are undisputed. Pursuant to that certain Asset Purchase

Agreement, dated September 10, 2001 (the "Asset Purchase Agreement"), the

Reorganized Debtors purchased from Pulver.com, Inc. Pulver.com Europe, Ltd.,

Pulver.com Asia Pacific, Ltd., and Pulver.com Conferences, Inc. (collectively, "Pulver")

substantially all of their assets (collectively the "Assets"), which consisted primarily of

3

two event brands.  In performing their obligations under the Asset Purchase Agreement, the Reorganized Debtors paid Pulver $36 million in cash on the closing date, and ultimately deposited $20,250,000 into escrow.  The purpose of the escrow was to secure payment of the remainder of the purchase price to Pulver pursuant to an "earn out" formula over time after an analysis of the events' earnings before interest, taxes, depreciation and amortization ("EBITDA").

During the quarter ended September 30, 2002, the Reorganized Debtors and Pulver agreed to eliminate the provisions of the Asset Purchase Agreement related to price adjustments for 2002, 2003, and 2004, and to set the final purchase price at $41,502,000.  The Reorganized Debtors and Pulver further agreed that the $20,250,000 already deposited into escrow would be distributed $16,005,000 to the Reorganized Debtors and $4,245,000 to Pulver.  The total and final purchase price of $41,502, 000 represented a value that can be calculated as 5.7 times EBITDA (which was slightly less than $7 million before the closing date).[2]

On January 24, 2003, the Reorganized Debtors sold the Assets back to Pulver for approximately $4,375,000.

REDACTED

[3]

The Reorganized Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, §§ 101-1532, (as amended, the "Bankruptcy Code"),

---

[2]  *See* Deposition of Peter Knepper ("Deposition Transcript"), page 75, lines 5-8, attached to the Appendix of Appellants.  That the Deposition Transcript is a part of the record here at all is a matter for another day. Suffice it to say that the Reorganized Debtors reserve all their rights with respect to (a) the falsity of the Interface Creditors' certificate claiming to have destroyed all documents subject to the parties' written confidentiality agreement and (b) the Interface Creditors' breach of the confidentiality agreement.
[3]  *See* Deposition Transcript, page 75, lines 9-15.

less than two weeks later, on February 2, 2003 (the "Petition Date"). The Plan was confirmed on June 4, 2003 and became effective on June 20, 2003.

On December 17, 2004, pursuant to Section 6.7(a) of the Plan, the Creditor Representative, on behalf of the Reorganized Debtors, filed an action to avoid two alleged fraudulent transfers: (1) the September 10, 2001 sale pursuant to which the Reorganized Debtors acquired the Assets from Pulver for a total purchase price of $41,502,000; and (2) the January 24, 2003 sale by which the Reorganized Debtors sold the Assets back to Pulver for approximately $4,375,000. In essence, the claim regarding the initial sale took the position that the Reorganized Debtors paid too much, and the claim regarding the second sale took the position that the Reorganized Debtors accepted too little.

Pulver filed an answer, and brought counterclaims against the Reorganized Debtors for breach of contract and indemnification. Pulver also filed a so-called Third Party Complaint against one of the Reorganized Debtors, MediaLive International, Inc. for breach of covenants of indemnification and warranty set forth in the 2001 and 2003 purchase agreements.

Before spending a host of money on discovery and experts, that would have significantly reduced the net value to creditors of any eventual recovery at trial, the Creditor Representative and the Reorganized Debtors (including Media Live International, Inc. ) engaged in a lengthy settlement process that resulted in a settlement of the multi-party litigation described above (the "Settlement"). The salient terms of the Settlement were: (1) Pulver agreed to pay the Creditor Representative $1,150,000, with

5

an initial $600,000 and monthly installment payments over the following six months;

(2) Pulver relinquished any claim to a dividend it might otherwise have gotten pursuant to

Bankruptcy Code section 502(h); and (3) all parties released one another from any and all

claims related to the Pulver transactions.[4]

The Reorganized Debtors filed their Motion for Order Approving Settlement

Between the Debtors and Avoidance Defendants (the "Motion") on June 13, 2005. The

Motion recited the background of the transactions, lawsuit, counterclaims and third party

complaint. It also offered a series of justifications for the Settlement.

None of the Reorganized Debtors' hundreds of creditors -- some of whom are

sophisticated and proactive hedge funds and commercial lenders -- objected to the

Motion. The Interface Creditors filed a written objection to the Motion. In support of

their Objection, the Interface Creditors filed a Supplement which attached a transcript of

a deposition of the Reorganized Debtors' Chief Financial Officer, Peter Knepper. The

Deposition Transcript contains significant amounts of information about the first and

second sales of the Assets, and sheds light on the merits of the Settlement. Contrary to

the suggestions made by the Interface Creditors in their Opening Brief, however, the

testimony given by Mr. Knepper is not overwhelming favorable to the Interface

Creditors' position. Indeed, as counsel for the Reorganized Debtors pointed out at the

hearing on the Motion, the Deposition Transcript actually favors the decision made by the

---

[4] *See* Settlement Agreement and Mutual Release, Exhibit A to Reorganized Debtors' Motion.

bankruptcy court.[5]  For instance, the following excerpts plainly support the

reasonableness of the Settlement:

# REDACTED

---

[5]  *See* Hearing Transcript, page 23, lines 4-7 (Mr. Novick:  "Since the transcript is more helpful than not, I
believe, in terms of the settlement, I don't object to it . . .")

7

49046-005\DOCS_DE:118301.1

# REDACTED

49046-005\DOCS_DE:118301.1

# REDACTED

It is clear that the foregoing evidence does not "overwhelmingly" favor the Appellant.

Rather, it demonstrates that a company facing difficult and unanticipated challenges

negotiated at arm's length to get as much value as it could for assets that were tarnished

by the aftermath of 9/11.  However, the important point is that the foregoing evidence

was before the bankruptcy court and weighed in connection with its adjudication of the

Motion.  Appellees further submit that this testimony refutes any contention that

Mr. Knepper's testimony establishes that the bankruptcy court abused its discretion.

**C.**    **The Bankruptcy Court's Ruling**

On October 7, 2005, the bankruptcy court issued its Opinion approving the

Settlement.  In the Opinion, the court devoted almost two pages to setting forth the

factual basis for the Motion and the Settlement.[6]  The Opinion also makes clear that the

---

[6]  The court's recitation of the facts takes up most of page 2 and all of page 3 of the Opinion.

49046-005\DOCS_DE:118301.1

bankruptcy court was fully aware of the parties' differing views regarding the merits of the Settlement.[7]

When it came time to describe the applicable law and apply it to the facts presented and positions taken, the bankruptcy court demonstrated that it had a detailed understanding of the Motion and the basis of the Interface Creditors' opposition. It did so through its application of the facts to the four-part test set forth *Myers v. Martin (In re Martin)*, 91 F.3d 389, 391 (3d Cir. 1996)[8]. For instance, in analyzing the first *Martin* factor, probability of success, the bankruptcy court was careful to set forth the legal metes and bounds of a fraudulent transfer claim under New York law and then examine the parties' arguments in such detail that the court's explanation and analysis take up five and one-half pages of the Opinion.[9]

Moreover, in analyzing the second of the *Martin* factors – difficulty of collection – the bankruptcy court noted the weakness of the Reorganized Debtors' showing in the Motion, stating that "[t]he Debtors also claim that Defendant is a privately held entity of unknown equity, and that its ability to pay a multi-million dollar judgment is highly questionable. This argument, however, is without evidentiary support."[10] In other words, the bankruptcy court was careful to sort through the facts and arguments and express doubt about the moving parties' showing as and when it felt such doubt was warranted.

---

[7]  The court's description of the positions of the parties occupies most of page 4 and all of page 5 of the Opinion.

[8]  Although the Interface Creditors cite to *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988) in their Opening Brief for the standards that a court should weigh in considering approval of a compromise or settlement (*see* Opening Brief, page 7), the *Woodson* factors are substantively identical to the *Martin* factors applied by the bankruptcy court below. As such, there is no dispute that the bankruptcy court applied the correct law in granting the Motion and approving the Settlement.

[9]  *See* Opinion, pages 8-13.

[10]  *See* Opinion, page 14.

With regard to the third *Martin* factor – complexity, expense, inconvenience and delay – the bankruptcy court began its analysis by explaining that "[i]t is undisputed that this matter would involve expert testimony, motion practice, and extensive discovery."[11] The court then went on to explain why an offer by the Interface Creditors to have its lawyers take the case on a contingency-type arrangement "may arguably mitigate the costs of litigation, but does not eliminate the costs involved, either monetarily, or in terms of the delay involved."[12]

Finally, in examining the fourth *Martin* factor – the paramount interests of creditors – the bankruptcy court was quick to note that "[a]s the largest independent claimholders in these proceedings, the Court has given the Objection of the Interface Creditors proper deference . . ."[13] The bankruptcy court went on, however, to note the support of other larger creditor constituencies, and deemed that support to be worthy of greater weight.[14] Appellees submit that this was a perfectly reasonable judgment to make in the court's exercise of its discretion.

## **ARGUMENT**

### A.    **Approval of a 9019 Compromise is Reviewed for Abuse of Discretion.**

Oddly, the Interface Creditors fail in their Opening Brief to identify the appropriate standard of review here. As the Third Circuit recently reiterated in *In re Nutraquest, Inc.,* 434 F.3d 639 (3rd Cir. 2006), the approval of a compromise of

---

[11] *See* Opinion, page 14.
[12] *See* Opinion, page 15.
[13] *See* Opinion, page 15. The offer was clearly a litigation tactic. Conflicts of interest would have prevented Adelson's lawyers from prosecuting claims belonging to the Reorganized Debtors' estates.
[14] *See* Opinion, page 16.

11

controversy under Federal Rule of Bankruptcy Procedure 9019 is reviewed on an abuse

of discretion standard. 434 F.3d at 644 (citing *Myers v. Martin (In re Martin)*, 91 F.3d

389, 391 (3d Cir. 1996)). The question of whether the bankruptcy court applied the

proper test in approving the settlement is reviewed *de novo*. *Id*. (citing *Fry's Metals, Inc.*

*v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002)). In explaining

how an appellate court should review the findings of a lower court (in the case of

*Nutraquest*, a district court), the Third Circuit explained that:

> We examine its findings for an abuse of discretion, at root a
> deferential standard of review. We do not "disturb an
> exercise of discretion unless there is a definite and firm
> conviction that the court . . . committed a clear error of
> judgment in the conclusion it reached upon a weighing of
> the relevant factors." *In re Orthopedic Bone Screw Prods.*
> *Liab. Litig.*, 246 F.3d 315, 320 (3rd Cir. 2001) (internal
> quotation marks omitted). Put another way, for us to find
> an abuse of discretion the District Court's decision must
> rest on "a clearly erroneous finding of fact, an errant
> conclusion of law or an improper application of law to
> fact." *Id*. (internal quotation marks omitted).

434 F.3d at 645.

### B.    The Bankruptcy Court Did Not Abuse its Discretion

Under Federal Rule of Bankruptcy Procedure 9019, a bankruptcy judge has the

authority to approve a compromise of a claim, provided that the debtor, trustee and

creditors are given twenty days' notice of the hearing on approval of a compromise or

settlement. *See* Fed. R. Bankr. P. 2002(a)(3), 9019(a). In deciding whether to approve a

settlement, the court must determine whether the proposed settlement is in the best

interest of the estate. *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa.

1986). The Third Circuit has held that this particular process of bankruptcy court

12

49046-005\DOCS_DE:118301.1

approval requires a bankruptcy judge to assess and balance the value of the claim that is

being compromised against the value to the estate of the acceptance of the compromise

proposal. *See In re Martin*, 91 F.3d 389, 393 (3rd Cir. 1996). Taking its cue from

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*

*Anderson*, 390 U.S. 414, 424-25 (1968), the Third Circuit recognized four criteria that a

bankruptcy court should consider in striking this balance: (1) the probability of success in

litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation

involved, and the expense, inconvenience and delay necessarily attending it; and (4) the

paramount interest of the creditors. *See Martin, supra.* Case law indicates that when

considering the relevant factors the court should avoid second-guessing the debtor or

trustee in the exercise of its business judgment, but rather should endeavor to ascertain

whether the terms of the Trustee's proposed settlement fall below the lowest range of

reasonableness. *See Neshaminy, supra,* at 803.

"The court is not supposed to have a 'mini-trial' on the merits, but should

'canvass the issues to see whether the settlement falls below the lowest point in the range

of reasonableness.'" *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D. N.J. 2000) (citing

*Neshaminy,* 62 B.R. at 803). As detailed in the Statement of Facts, the merits of the

Settlement were fully briefed and then argued. As the Opinion establishes, the

bankruptcy court engaged in a thorough and thoughtful canvassing of the Settlement and

the issues raised.[15] That canvassing looked at all four *Martin* factors, considered the

---

[15]   Indeed, It should not go unnoticed that Judge Baxter's opinion approving the Motion is longer than Interface's Opening Brief.

Knepper testimony, and rejected the arguments made by the Interface Creditors, after considering them.  Nevertheless, Appellees will refute the Interface Creditors' arguments again here.

Probability of Success:  The Interface Creditors claim that the testimony of Mr. Knepper regarding the company's not hiring an investment banker somehow establishes that the sale must have been a fraudulent transfer.  Putting aside the question whether incurring the expense of a qualified investment banker to sell a business of such modest size would make economic sense under any circumstances, in fact, what Mr. Knepper's testimony shows is that **REDACTED**

[16]  As Mr. Caine explained to the bankruptcy court, the $4.375 million purchase price, plus the $1,150,000 settlement amount, totals $5,525,000, or a 5.53 EBITDA multiplier (which is almost the same as the 5.7 multiplier used to value the original sale before September 11, 2001 and the internet bust sent the value of the assets spiraling downward).[17]  When the value of the agreed-upon waiver of Pulver's Bankruptcy Code section 502(h) claim is figured in, the spread becomes even narrower. Thus, the total consideration of the sale plus the Settlement provides the estates approximately what they could reasonably expect to recover if they spent years and hundreds of thousands or millions of dollars litigating the action to judgment.

The Interface Creditors make another argument based on Mr. Knepper's testimony, namely that the companies were sold to make one last payroll prior to filing

---

[16]  See Deposition Transcript, page 75, lines 9-15.
[17]  Mr. Caine's argument in this regard (where he mistaken referred to it as a 5.43 multiplier) can be found in the Hearing Transcript, page 25, line 11 through page 26, line 4.

14

bankruptcy. While this is true, there is nothing shameful or wrong about it *so long as the value obtained is fair and there is a business reason for the sale.* In this regard, Mr. Knepper's testimony provides the business reason: the companies' secured lenders, a group of national commercial banks, refused to lend any new money to the companies but agreed to release their liens in the Pulver assets to permit the companies to sell the assets and use the proceeds to keep the business from going dark and hemorrhaging value (which would surely have left unsecured creditors such as the Interface Creditors with no recoveries at all). As Mr. Knepper explained in the Deposition Transcript:

# REDACTED

Thus, rather than support the Interface Creditors' contentions, the Knepper testimony establishes why the bankruptcy court did not abuse its discretion in finding that the probability of success was in line with the amount agreed to be paid in the Settlement.

    <u>Difficulty of Collection</u>: The Interface Creditors do not dispute the bankruptcy court's finding on this prong of the *Martin* test.

    <u>Complexity, Expense, Inconvenience and Delay</u>: On this prong, the Interface Creditors really have no argument because they did not deny the fraudulent transfer case

---

[18] *See* Deposition Transcript, page 73, lines 7 through 15.
[19] *See* Deposition Transcript, page 76, lines 19 through 21.

49046-005\DOCS_DE:118301.1

would be expensive and take a long time. Rather, the Interface Creditors attempted to dodge these real issues by saying that (a) the chapter 11 case had been expensive (a matter of complete irrelevance); (b) the Interface Creditors disagreed with the Creditor Representative and the Reorganized Debtors regarding their cost/benefit analysis of the litigation; and (c) the Interface Creditors were willing to take over the case on a modified contingency basis. As the bankruptcy court correctly pointed out, none of these arguments changed the fact that the litigation resolved by the Settlement would be complex, expensive and take a long time. Thus, the bankruptcy court cannot be said to have abused its discretion in finding that this factor supports the Settlement.

Paramount Interests of Creditors: As discussed above, the Creditor Representative is a third party independent post-confirmation fiduciary for the entire class of creditors that will receive the recoveries from any possible settlement or judgment, much like a trustee is often a third party independent pre-confirmation fiduciary. The bankruptcy court noted that many more creditors were in favor of the Settlement, and deemed it worthy of approval. No creditors, other than the gadfly Interface Creditors, objected -- including noteholders who have larger claims than the Interface Creditors and much experience with and involvement in bankruptcy litigation.

## C.    The Interface Creditors Cannot Challenge the Manner in Which the Moving Parties Made Their Showing

The Interface Creditors' fundamental contention is that the bankruptcy court erred in relying upon the arguments of counsel and, in the Interface Creditors' opinion, not making an independent factual inquiry. This argument fails for three reasons. First, the

16

Interface Creditors failed to raise this argument before Bankruptcy Judge Baxter.

Instead, they were equally content to argue the facts as all parties knew them – attacking

the Settlement only as being a bad deal for the estate and creditors.  Second, the Court did

have evidence before it in the form of the pleadings and the Deposition Transcript.

Third, the vast majority of facts are undisputed between the parties.  The only material

point of contention is whether the uncontested facts add up to a good deal or a bad deal.

Hearing first-hand testimony of undisputed facts -- which as a matter of law is not

required, and rarely appropriate, to adjudicate a Rule 9019 motion -- would have added

nothing except expenses.

> **1.    The Interface Creditors Waived Their Right to Argue
> that the Showing in Support of the Motion was Insufficient.**

"[A]rguments asserted for the first time on appeal are deemed to be waived and

consequently are not susceptible of review . . . absent exceptional circumstances (e.g., the

public interest requires that the issues be heard or manifest injustice would result from the

failure to consider such issues)."  *Brown v. Philip Morris Inc.,* 250 F.3d 789, 799 (3rd Cir.

2001) (citing *United States v. Anthony Dell'Acquilla Enter. & Subsidiaries,* 150 F.3d

329, 335 (3d Cir. 1998); and *United Parcel Serv. Inc. v. International Brotherhood of*

*Teamsters,* 55 F.3d 138, 140 n. 5 (3rd Cir. 1995).

Looking at the arguments advanced by the Interface Creditors, it becomes clear

that they never argued (in their Objection or in their oral presentation at the hearing) that

the manner in which the Creditor Representative and the Reorganized Debtors made their

showing was insufficient.  Indeed, if the Interface Creditors had demanded a proffer or

asked to cross-examine a witness, the bankruptcy court would have offered the moving

parties an opportunity to put a witness on the stand to testify in favor of the Settlement.

The bankruptcy court could also have ruled that no testimony was required or

appropriate. There was no objection and, accordingly, no witness ever took the stand.

What the Interface Creditors did instead of objecting was argue that the showing

as made by counsel did not provide the court with enough information in light of the

counter-showing made by the Interface Creditors' counsel. In other words, the Interface

Creditors chose to put their evidence in through the arguments of counsel and simply

argue the weight of those arguments against the weight of the moving parties' arguments.

The rule of *Brown v. Philip Morris Inc., supra,* exists to prevent one side from

"sandbagging" the other. It should apply here. Finally, no "exceptional circumstances"

are apparent here to avoid the rule of waiver for failing to argue the point below. The

Interface Creditors had every opportunity to voice their objections differently, but chose

not to.

2.    <strong>The Deposition Transcript Establishes that<br>the Bankruptcy Court Did Not Abuse its Discretion.</strong>

While the story is a sad one, Peter Knepper's testimony found on pages 71

through 81 of the Deposition Transcript shows a company that: did due diligence before

entering into the first purchase; agreed to a purchase transaction with a sliding scale earn

out feature that allowed future results of the businesses to adjust the ultimate purchase

price; saw its businesses lose most of its value as a result of global economic factors

completely outside its control; initially hoped to sell the businesses in the second sale for

18

a bit more money, but could not as a result of the secured lenders whose collateral the

assets were; and sold the businesses the second time in an indisputably arm's-length

transaction while attempting to preserve the value of the companies so that they would be

positioned for bankruptcy (and the very favorable restructuring that resulted thereafter).

These facts, which were indisputably treated as proffered evidence by the parties and

considered by the bankruptcy court, support the approval of the Settlement.

### 3.     Almost All Facts Are Undisputed.

Other than the conclusion the bankruptcy court drew from the facts

presented, there is very little about the facts underlying the Motion that the Appellees and

the Interface Creditors disagree about.  No one disputes the timeline of the transactions or

the consideration realized by the companies.  No one disputes the accuracy of the

testimony contained in the Deposition Transcript.  Because the applicable standard is

abuse of discretion, the Interface Creditors cannot prevail here.

## CONCLUSION

The Interface Creditors -- whose motives here are questionable at best --

attempt to take slivers of Mr. Knepper's testimony and use them out of context does not

come remotely close to meeting the high standard of demonstrating an abuse of discretion

49046-005\DOCS_DE:118301.1

by the bankruptcy court. The essential facts are not in dispute. Nor is the fact that the

bankruptcy court applied the proper legal standard and duly exercised its discretion. The

ruling should be affirmed.


Dated: May 17, 2006

Laura Davis Jones (DE Bar No. 2436)
Andrew W. Caine (CA Bar No. 110345)
Sandra G. M. Selzer (DE Bar No. 4283)
PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP
919 North Market Street, 17th Floor
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400

**Counsel for Creditor Representative and Special
Counsel for Reorganized Debtors**

John H. Knight (DE Bar No. 3848)
Jason M. Madron (DE Bar No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:   (302) 651-7701

- and -

David M. Friedman
Robert M. Novick (*pro hac vice*)
KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP
1633 Broadway
New York, NY 10019
Telephone:  (212) 506-1700
Facsimile:   (212) 506-1800

**Co-counsel for Reorganized Debtors**

20